**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ROBERT A. BLOMQUIST, | |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| | Case No. 2:04-CV-1101DB |
| JO ANNE B. BARNHART, | |
| Commissioner of Social Security | District Judge Dee Benson |
| Defendant. | Magistrate Judge David Nuffer |

This case was referred to Magistrate Judge David Nuffer under 28 U.S.C.
§ 636(b)(1)(B). The undersigned was directed to manage the case, receive all motions, hear oral arguments, conduct evidentiary hearings as deemed appropriate and submit to the District Judge a report and recommendation for the proper resolution of dispositive matters presented.

## NATURE OF THE CASE

Claimant filed for Adult Disability Insurance Benefits and Supplemental Income Benefits in April 2002. Claimant brought this action pursuant to 42 U.S.C. § 405 (g), which provides for judicial review of the final decision of the defendant, the Commissioner of the Social Security Administration.

## ISSUE PRESENTED

While Claimant raises other issues, the principal issue presented is whether Claimant's due process was violated when the Administrative Law Judge refused to allow the Claimant the right to cross-examine a post-hearing consultative medical expert.

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 1

    1. Procedural History ................................................................................... 1

    2. Medical History Presented at Hearing ..................................................... 2

    3. Post Hearing Medical Examinations ........................................................ 5

    4. Additional Evidence Submitted to the Appeals Council ........................... 8

    5. Claimant's Testimony at the Hearing .................................................... 10

    6. Vocational Expert Testimony ................................................................ 11

DISCUSSION .......................................................................................................... 13

    1. Framework for Analysis ........................................................................ 13

    2. Decision of ALJ .................................................................................... 14

    3. Claimant's Argument ............................................................................ 15

    4. Failure to Permit Cross Examination, Written Inquiry or Rebuttal of a Post Hearing Medical Report is a Denial of Due Process ........................................................ 15

    5. On Remand, All Factors Relating to RFC Should Be Considered ........................... 18

    6. The Hypothetical Question to the VE Was Inadequate ........................... 19

    7. Failure to Provide Comprehensive neuropsychological Testing Before Final Decision ...................................................................................... 20

RECOMMENDATION ............................................................................................. 21

## BACKGROUND

**1. Procedural History**

      Claimant, Robert A. Blomquist, filed applications for Adult Disability Insurance Benefits ("DIB") and Supplemental Income Benefits ("SIB") on April 26, 2002.  Mr. Blomquist was denied benefits on July 9, 2002 and again on request for reconsideration on July 29, 2002.[1] Mr. Blomquist requested a hearing before an Administrative Law Judge ("ALJ"),[2] which was held on August 18, 2003.[3]  At the August 13, 2003 hearing, counsel for Mr. Blomquist requested that the record be kept open so that additional comprehensive testing could be administered.[4] Counsel for Mr. Blomquist requested both comprehensive neurological and psychological evaluations.[5]  The examinations were performed on October 22, 2003 (neurological) and October 28, 2003 (psychological).  On November 13, 2003, counsel for Mr. Blomquist requested the opportunity to cross-examine, or have interrogatories sent to Dr. Ottowicz, who performed the neurological examination.[6]  In his January 14, 2004 opinion, the ALJ denied this request, stating that he found "no basis  . . . for [claimant's] request that he be allowed to cross-examine or submit interrogatories to the consultative neurologist."[7]

      On January 14, 2004, the ALJ denied Mr. Blomquist's disability claims.  Based on the testimony of the vocational expert, the ALJ found that there are occupations that the claimant is capable of performing, including his past relevant work as a telephone solicitor.[8]  The Appeals Council considered Mr. Blomquist's request for review on November 22, 2004, which included

---

[1] R. 85-86.
[2] R. 87.
[3] R. 24-84.
[4] R. 30-36, 81-82.
[5] R. 81.
[6] R. 170-71.

additional medical evidence, but determined that there was no basis for changing the ALJ's decision.[9]

## 2.  Medical History Presented at Hearing

Notes from Mr. Blomquist's medical records show that he has an enlarged prostate,[10] a history of kidney stones, amblyopia, or diminishing vision, thrombophlebitis, and occasional numbness in the right hand.[11]

On May 29, 2002, Richard J. Ingebretsen, M.D., performed a consultative medical examination of Mr. Blomquist in connection with Mr. Blomquist's application for benefits.[12] During the medical examination Mr. Blomquist gave his own medical history in which he reported that he has had problems with his knee cap since 1980, and that he has eye problems which have required six surgeries.[13]  Mr. Blomquist stated that he does not drive or watch television because of his eyes, both of which have developed cataracts.  Mr. Blomquist stated he can walk about one or two blocks, and can only lift about ten pounds. [14]  Dr. Ingebretsen noted that Mr. Blomquist can use his upper extremities to reach overhead and to care for his personal needs of eating, dressing, and washing.[15]  Dr. Ingebretsen further notes that Mr. Blomquist can walk slowly up stairs, doesn't use a crutch or cane when walking, and doesn't run because it hurts his knees.[16]  Mr. Blomquist can sit for one hour, stand for thirty minutes, and can do light

---

[7] R. 20.
[8] R. 22.
[9] R. 4-6.
[10] R. 173.
[11] R. 176, 17-79, 183, 188-89.
[12] R. 191-93.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] R. 192.

house work and cleaning.[17]   On examination Dr. Ingebretsen notes that Mr. Blomquist's eye was focused to the right.  Mr. Blomquist had no pedal edema, cyanosis, or clubbing on his outer extremities, and his knees were not swollen or tender to the touch.[18]  Mr. Blomquist had a normal reflexes, as well as gait and station, and was able to hop on both the right and left foot and approximate his fingers to his thumbs on both hands.  Dr. Ingebretsen noted that Mr. Blomquist could only stoop to about 70% of normal.[19]  Mr. Blomquist's muscle strength was full in both the lower and upper extremities.[20]  Dr. Ingebretsen diagnosed knee pain, noting that the patient had full Range of Motion in his knees without crepitus.  Mr. Blomquist's right knee popped once while moving it.  Dr. Ingebretsen noted that Mr. Blomquist walked normally without the use of the cane, and was able to walk normally down the hall, but that he did walk slowly.[21]  Dr. Ingebretsen also diagnosed poor vision and noted that Mr. Blomquist "has a hard, if not very difficult time reading."[22]  "He can see things… but he could not read normal print on paper.  His vision is somewhat clouded [by] cataracts.  He held onto his wife when walking."[23] X-Rays of the knees taken the same day show mild bilateral tibial spurring.[24]

On June 25, 2002, Kim Taylor, M.D., performed an ophthalmologic examination of Mr. Blomquist.[25]  Dr. Taylor noted that Mr. Blomquist has a history of sore eyes and had muscle surgeries five times before the age of nineteen because of cross eyed situations.  Dr. Taylor noted that Mr. Blomquist's corrected vision was 20/40 in the right eye and 20/25- in the left eye.  Dr.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] R. 193.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] R. 194.
[25] R. 195.

Taylor noted further that Mr. Blomquist had exotropia with a tendency to cross fixation, as well as minimal early cataracts.[26] Dr. Taylor diagnosed presbyopia, possible amblyopia in the right eye, and minimal early cortical cataracts.  Dr. Taylor stated that Mr. Blomquist's visual acuity should give him "adequate" vision.[27]

On July 3, 2002, a State agency physician reviewed the medical evidence and completed a Physical Residual Functional Capacity Assessment ("PRFCA").[28]  In this assessment the State agency physician determined that Mr. Blomquist had idiopathic visual field loss, presbyopia with cataracts, and strabismus, and that he "probably shouldn't do work which requires full vision fields."[29]  The State agency physician determined that Mr. Blomquist did not have any other exertional or nonexertional limitations.[30]

On July 11, 2003, Mr. Blomquist visited his primary care physician, Steven Towner, M.D., for the first time in over nine years.  Mr. Blomquist noted that he had retired in March of 2003, and that he was working with an attorney "in an attempt to get Social Security Disability based on hand-eye coordination difficulties and inability to keep up with manufacturing processes." [31]  Dr. Towner noted that Mr. Blomquist's blood pressure was elevated, and recommended that Mr. Blomquist restart his blood pressure medication, which may help prevent kidney stones.   Dr. Towner further noted that Mr. Blomquist has an enlarged prostate, hypertension, benign prostatic hypertrophy, and numbness in his right hand when he carried books.  Dr. Towner noted that despite the occasional numbness in his right hand, both arms

---

[26] *Id.*
[27] *Id.*
[28] R. 204-11.
[29] *Id.*
[30] *Id.*
[31] R. 213.

appear to be normal, and recommended a neurological examination.[32]

On August 6, 2003, Mr. Blomquist underwent a Functional Capacity Evaluation by Steve Crandall, P.T., to determine his ability to perform work activity with his right and left upper extremities.[33]  Mr. Blomquist reported that he was working as an Animal Technician in 1992, when he had a sudden onset of right upper extremity pain and numbness and was later diagnosed with a cubital thrombosis in the right upper extremity.  Mr. Blomquist reported that he could sit for sixty minutes, and stand for thirty minutes.[34]  Mr. Crandall observed that Mr. Blomquist uses a "hunt and peck method" on the keyboard, and that his movements are slow, deliberate and require constant focus.  Mr. Crandall noted that Mr. Blomquist could safely lift up to twenty pounds on an infrequent basis, but that he cannot lift frequently or he would fatigue or lose control of his movement.[35]  Mr. Crandall further noted that Mr. Blomquist's grip and pinch strengths are below normal for an average male.  Mr. Blomquist's greatest limitation is in his coordination and lack of sensation on the right hand.[36]  Mr. Crandall notes that Mr. Blomquist would not be able to work in any environment where speed or repetition was a component of the job.[37]

**3.  Post Hearing Medical Examinations**

As mentioned earlier, two comprehensive medical examinations were performed after the hearing at the request of the Claimant.[38]  Counsel for Mr. Blomquist requested the

---

[32] *Id.*
[33] R. 215.
[34] *Id.*
[35] R. 217.
[36] *Id.*
[37] *Id.*
[38] R. 81.

opportunity to cross-examine, or have interrogatories sent,[39] but the ALJ denied this request.[40]

On October 22, 2003, Josef Ottowicz, M.D., performed a neurological evaluation of Mr. Blomquist in order to evaluate Mr. Blomquist's knee pain, idiopathic visual field loss and lack of coordination.[41] Mr. Blomquist reported a history of chronic knee problems, but was not currently taking any medication for his knee pain. Mr. Blomquist also reported that he walks one to two blocks a day without the use of a cane. Mr. Blomquist reports that he has had problems all his life with weak muscles in his right eye and that he uses bi-focal glasses.[42] The cause of his vision problems has never been determined. Mr. Blomquist reports coordination problems that are slowly getting worse.[43] Dr. Ottowicz's general observation was that Mr. Blomquist appeared comfortable during the examination and had no difficulty changing positions or performing range of motions.[44] During the neurological examination Dr. Ottowicz noted that Mr. Blomquist was fully alert and aware. Mr. Blomquist's language, speech, memory, concentration, affect and fund of knowledge were normal. He did appear to have mild mental impairment.[45] Dr. Ottowicz observed that there was no evidence of atrophy in Mr. Blomquist's muscles. Mr. Blomquist had full strength in his extremities and grip. He had normal muscle bulk and tone, normal coordination in his upper and lower limbs and normal but slow fine motor movements.[46] Mr. Blomquist was uncoordinated in his hands and had difficulty walking normal tandem gait on the strait line and on tiptoes and heels. Dr. Ottowicz noted that Mr. Blomquist

---

[39] R. 170-71.
[40] R. 20.
[41] R. 222.
[42] Id.
[43] R. 223.
[44] Id.
[45] R. 224.
[46] Id.

was very unsteady and slow as he walked and that he had abnormal hand swings along his body.[47]  Mr. Blomquist had decreased sensation in all four limbs and on the face.  He performed all of the ranges of motion without any assistance and there is no evidence of any abnormalities in the joints.  Dr. Ottowicz stated that Mr. Blomquist had decreased visual acuity and abnormal eye movements.[48]  Dr. Ottowicz further stated that it is possible that Mr. Blomquist "has mild cerebral palsy or a congenital brain abnormality responsible for his dysfunctional coordination. His condition is fixed and will never improve."[49]  Dr. Ottowicz notes that this condition has been present for Mr. Blomquist's entire life and will remain such for the rest of his life.[50]

On October 28, 2003, Liz McGill, Ph.D, performed a clinical interview and mental status examination of Mr. Blomquist.  Mr. Blomquist reported that he drank water frequently and had to use the men's room every fifteen to thirty minutes.  Dr. McGill noted, however, that Mr. Blomquist did not use the restroom facilities at all during the two hours he was in the office.[51] Dr. McGill observed that Mr. Blomquist was basically unkempt and that his right eye wandered off towards the side.  Mr. Blomquist reported that he had worked as a demo specialist at Costco and that he had left so that he could work independently but he had not been able to build a customer base at his independent sales business.[52]  Mr. Blomquist reported a varied work history, including being let go from jobs for personality conflicts as well as coordination problems.[53]  He and his wife share the chores, and pay the bills and do the shopping together. Mr. Blomquist reported that he holds a position in his church and is able to take care of his

---

[47] *Id.*
[48] R. 225.
[49] *Id.*
[50] *Id.*
[51] R. 226.
[52] R. 226-27.

grooming and hygiene needs.[54]

Dr. McGill observed that Mr. Blomquist was cooperative and displayed normal motor behavior during the examination.[55]  Dr. McGill notes that Mr. Blomquist's memory is intact, but he appears to have a suspected learning disability, and he is very literal and concrete in his thinking.  Dr. McGill further notes that Mr. Blomquist's mood was within normal limits.  There was some slowness in his perceived thought process, but he was never confused or unclear about what was being asked and there was no evidence of thought disorder.[56]  Mr. Blomquist demonstrated adequate ability to focus, concentrate, and pay attention.  He was able to answer the questions, and complete the tasks, presented to him.  Dr. McGill assessed a learning disorder, not otherwise specified and assigned a Global Assessment Functioning ("GAF") score of 62.[57]

Dr. McGill completed a medical source statement of Mr. Blomquist's mental ability to do work-related activities.[58]  In this statement Dr. McGill noted no, or slight limitations in all the areas of mental functioning, except for moderate limitations in the following areas: carrying out detailed instructions, the ability to make judgments on simple work-related decisions, appropriately responding to work pressures or to changes in routine in a work setting.[59]

## 4.  Additional Evidence Submitted to the Appeals Council

On January 22, 2004, Shelly L. Wood, PA.C, a physician's assistant at the Veterans Administration ("VA") clinic performed an examination when Claimant presented to enroll with

---

[53] R. 227-28.
[54] R. 228.
[55] *Id.*
[56] R. 228-29.
[57] *Id.* (GAF scores between 70 and 60 can indicate some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed., 1994)).
[58] R. 231-32.

a primary care provider.[60]  Claimant reported that his chronic problems with fine motor and

gross motor coordination were increasing.[61]  Claimant reported that the only medications he took

were over the counter vitamins.  Ms. Wood reported that Mr. Blomquist had some difficulty with

heel-to-toe walking and rapid alternating hand movements, and scheduled diagnostic testing.[62]

A brain MRI taken in June 2004 revealed "mild nonspecific white matter changes likely

related to chronic small vessel ischemic disease in patient of this age.  No evidence of acute

intracranial abnormality."[63]

On August 13, 2004, John Singleton, M.D., of the VA clinic examined Claimant.[64]

Claimant reported to Dr. Singleton that he had lost his job at a telemarketing company for being

too slow at typing reports, and stated that he had life-long hand-eye coordination.  After the

evaluation Dr. Singleton determined that Mr. Blomquist's symptoms "may be consistent with a

previous perinatal injury (cerebral palsy) with subsequent usual brain aging causing minor

deterioration from baseline . . ."[65]  Dr. Singleton reports that he is concerned about possible

Parkinsonism syndrome as well.  He did not suggest any therapy at this time, but stated that Mr.

Blomquist is to see a primary care physician that same day for further evaluation and therapy.[66]

On September 22, 2004, Counsel for Mr. Blomquist referred him to Ronald P. Houston,

Ph.D., for neuropsychological evaluation.[67]  Dr. Houston administered the Dementia Rating

---

[59] *Id.*
[60] R. 242-44.
[61] R. 242.
[62] R. 243.
[63] R. 240.
[64] R. 246-48.
[65] R. 247.
[66] *Id.*
[67] R. 249-53.

Scale (DRS) and found that Mr. Blomquist is "severely impaired."[68]  Mr. Blomquist's DRS

Total Raw Score was 118, which is five points below the designated cutoff score for the elderly

population.  Dr. Houston stated that Mr. Blomquist's pattern of subtest scores "would be most

consistent with a condition that is mild in severity and progressive in course."[69]  Dr. Houston

further stated that Mr. Blomquist's prospects for successful employment are extremely poor.[70]

## 5.  Claimant's Testimony at the Hearing

At the August 18, 2003 hearing before the ALJ Mr. Blomquist testified that he was let

go from his last job on January 15, 2001.  Mr. Blomquist testified that this was because he cut

his finger while he was demonstrating a product at Costco and because he had to use the

restroom several times.  Mr. Blomquist stated that he had to go to the bathroom every half hour

because he consumed large amounts of water to flush out his kidneys after having a kidney stone

several years ago.[71]  Mr. Blomquist stated that he developed inflammation under the cartilage of

the kneecap, and that he can only stand for thirty minutes.[72]  Mr. Blomquist testified that he has

had hand-eye coordination problems throughout his life.[73]  He testified that these hand-eye

coordination problems contribute to his poor "hunt and poke method" typing skills.[74]  Mr.

Blomquist demonstrated the ability to read typed twelve point font.[75]  He stated that he does not

drive, that his wife does the cooking, and that they take care of the shopping together.[76]  Mr.

Blomquist testified that he could be out shopping for three hours, and that he could lift a gallon

---

[68] R. 249.
[69] R. 250.
[70] *Id.*
[71] R. 37-38.
[72] R. 39-40.
[73] R. 42.
[74] R. 44.
[75] R. 48.
[76] R. 48-52.

of milk.[77]

Mr. Blomquist stated that on a typical day, as soon as he starts drinking water he has to use the bathroom every thirty minutes.[78]  He and his wife walk to the library for about thirty minutes to use the internet.[79]

Mr. Blomquist stated that his bathroom breaks were unexpected and could not be scheduled.[80]  He further stated that he is not on any medication.[81]  He testified that he could stand for a half hour at a time and for three and one-half hours in an eight hour work day.[82]

### 6.  Vocational Expert Testimony

A vocational expert ("VE"), Dina Galli, testified at the hearing.[83]  The VE stated that Mr. Blomquist's previous jobs as a dishwasher and janitor would be classified as medium and unskilled in the *Dictionary of Occupational Titles* ("DOT").  Mr. Blomquist's jobs as a telephone solicitor and Costco demonstrator were both semiskilled.[84]

The ALJ posed a hypothetical situation to the VE of an individual the Claimant's age, education, and past relevant work who could perform sedentary work with lifting eight and a half to ten pounds; standing and walking fifteen to thirty minutes at a time; sitting seven hours a day with one hour on his feet with a sit/stand option; working in an area with a restroom nearby.[85] The VE testified that such an individual could perform the work of telephone solicitor.[86]  The VE further testified that such an individual with pervious work as a telephone solicitor could

---

[77] R. 51-52.
[78] R. 55.
[79] R. 57-59.
[80] R. 63.
[81] R. 64.
[82] R. 65.
[83] R. 66-78.
[84] R. 70-71.
[85] R. 71-72.

transfer to work as a telephone answering service operator.[87]

    The ALJ then changed the hypothetical to add in some of the limitations that were testified to in the hearing.  The VE testified that it would not be tolerated for the individual to be seen visiting the restroom quite frequently and that at the jobs previously listed would allow virtually no time away from the workstation other than lunch and breaks.[88]  The VE reduced the number of jobs available to an individual who used the hunt-and-peck method of typing by fifty to seventy-five percent.[89]

---

[86] R. 72.
[87] R. 73.
[88] R. 74.
[89] R. 77-78.

## DISCUSSION

### 1. Framework for Analysis

Under the Social Security Administration's regulations "disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[90]  The regulation stipulates that in order for an individual to meet this definition he must have severe impairment(s) such that he is "unable to do [his] past relevant work or any other substantial gainful work that exists in the national economy."[91]

If the severe impairment(s) of the individual does not meet or equal a listing in the "Listing of Impairments"[92] then the individual's residual functional capacity ("RFC") will be assessed.  The RFC is defined as "the most you can do despite your limitations."[93]  It is the Claimant's responsibility to present evidence for the commissioner to use to make a finding about the RFC.[94]  Before making a determination on disability, the Commissioner will arrange a consultative examination if necessary, and "make every reasonable effort" to help claimant obtain medical records.[95]

The Commissioner uses the following five step sequential evaluation process to determine whether a person is disabled:

    1)   A person who is working is not disabled.[96]

---

[90] 20 C.F.R. § 404.1505 (a).
[91] Id.
[92] 20 C.F.R. pt. 404, subpt. P, app.1.
[93] 20 C.F.R. § 404.1545 (a)(1).
[94] 20 C.F.R. § 404.1545 (a)(3).
[95] Id.
[96] 20 C.F.R. § 404.1520 (a)(4)(i).

2) A person who does not have a severe medically determinable physical or mental impairment or combination of impairments severe enough to meet the duration requirement is not disabled.[97]

3) A person who has impairment(s) that meet or equals one of the listings in the "Listing of Impairments"[98] will be found to be disabled.[99]

4) A person who is able to do past relevant work is not disabled.[100]

5) The RFC of a person who is not able to do past relevant work is assessed, as well as his age, education, and work experience to see if he can make an adjustment to other work.  A person who can make an adjustment to do other work is not disabled.[101]

## 2.  Decision of ALJ

The ALJ followed this five-step sequential evaluation process.  At the first step, the ALJ found that the claimant has not performed any substantial gainful activity since January 15, 2001.[102]  At the second step, the ALJ found that severe impairments have been diagnosed and treated and that these impairments are of sufficient duration to "more than minimally limit the claimant's ability to perform basic work activities."[103]  At the third step, the ALJ found that the claimant's severe impairments do not meet or equal any on the listing of impairments.[104]  At the fourth step, the ALJ determined that the claimant can perform his past relevant work as a telephone solicitor.[105]  At the fifth step, the ALJ alternatively determined, based on the testimony of the vocational expert, that occupations exist in significant numbers in the national economy which claimant is capable of performing, and that the claimant is therefore "not disabled."[106]

---

[97] 20 C.F.R. § 404.1520 (a)(4)(ii).
[98] 20 C.F.R. pt. 404, subpt. P, app.1.
[99] 20 C.F.R. § 404.1520 (a)(4)(iii).
[100] 20 C.F.R. 404.1520 (a)(4)(iv).
[101] 20 C.F.R. § 404.1520 (a)(4)(v).
[102] R. 16.
[103] R. 16-17.
[104] R. 17.
[105] R. 21.
[106] R. 22.

### 3.  Claimant's Argument

Claimant makes five assertions of error: first, the Commissioner failed to properly assess Claimant's RFC; second, the Commissioner failed to make findings on all of the claimant's severe impairments; third, the Commissioner failed to present a proper hypothetical question to the vocational expert; fourth, the Commissioner failed to provide comprehensive neuropsychological testing before the final decision; and fifth, the Commissioner failed to afford the Claimant adequate due process of law by preventing him from cross examining and serving written questions on the Commissioner's neurological expert.[107]  The claimant also mentions that he disputes the ALJ's "finding at step three that Mr. Blomquist's condition does not meet or equal a listing,"[108] but this argument is not developed beyond a statement that improper RFC formulation may impede proper consideration of listing qualification.[109]

### 4.  Failure to Permit Cross Examination, Written Inquiry or Rebuttal of a Post Hearing Medical Report is a Denial of Due Process

Claimant argues that the Commissioner failed to afford him due process of law by preventing him from cross examining and serving inquiries upon the Commissioner's neurological expert.  The Tenth Circuit has recently held in *Yount v. Barnhart* that "an ALJ's use of a post-hearing medical report constitutes a denial of due process because the applicant is not given the opportunity to cross-examine the physician or to rebut the report."[110]

---

[107] Brief of Petitioner-Appellant at 13, Robert A. Blomquist v. Jo Anne B. Barnhart, No. 04-1101.

[108] *Id.* at 14.

[109] *Id.*

[110] 416 F.3d 1233, 1235 (10th Cir. 2005) (quoting *Allison v. Heckler*, 711 F.2d 145, 147 (10th Cir. 1983)).

Claimant's hearing before the ALJ was held on August 10, 2003.[111]  In that hearing, Claimant requested, and the ALJ agreed to order, diagnostic neurological examination.[112]  On October 22, 2003, Dr. Ottowicz performed a comprehensive medical disability evaluation on Mr. Blomquist.[113]  The ALJ also ordered a mental status evaluation which took place on October 28, 2003 by Liz McGill, Ph.D.[114]  Claimant requested[115] but was refused[116] the opportunity to cross examine or serve inquiries after either the medical or mental evaluation, and the ALJ's final decision was based upon the findings of these evaluations.[117]

Defendant distinguishes this case from *Yount* by stating that in *Yount* there were only two pieces of evidence in the medical record.  By contrast, in this case there were numerous treatment records as well as consultative examinations.  It is also true that the ALJ in this case did not base his decision solely on the findings of the post-hearing consultative reports, as the ALJ did in *Yount.*[118]  However, *Yount*'s requirement of cross examination or written inquiry of the post-hearing consultative examiner does not depend on the ALJ's exclusive reliance on the post hearing information.

The decision in *Yount* was based on another Tenth Circuit case, *Allison v. Heckler.*[119] In *Allison*, the Claimant was denied disability benefits.  After the ALJ's hearing, the Claimant's medical records were sent to a doctor.  The doctor's medical report became the basis for the ALJ's decision.  Claimant argued that she was denied due process because she had "no notice of

---

[111] R. 28-84.
[112] R. 81-82.
[113] R. 18.
[114] *Id.*
[115] R. 170-71.
[116] R. 20.
[117] R. 18-24.
[118] Brief of Defendant, *supra* note 68, at 21.
[119] *Allison v. Heckler*, 711 F.2d 145 (10th Cir. 1983).

the report, not opportunity to cross-examine . . ., and no opportunity to offer evidence in rebuttal.[120]  On appeal, the court stated, "An ALJ's use of a post-hearing medical report constitutes a denial of due process because the applicant is not given the opportunity to cross-examine the physician or to rebut the report."[121]  Thus, the failure to permit cross-examination was a constitutional error.

The *Yount* opinion gives another reason for reversal:  "The Secretary is clearly mandated by statute to determine a claimant's disability 'on the basis of evidence adduced at the hearing.'"[122]  The use of post-hearing evidence is not statutorily authorized.  The proper procedure contemplates the constitutionally required cross examination.  "Should the Secretary wish to reopen the hearing and properly admit [the doctor's] report, [claimant] must be provided the opportunity to subpoena and cross-examine [the doctor], and to offer evidence in rebuttal."[123]

In this case, the ALJ based much of his decision on post-hearing medical examinations, without properly reopening the hearing and admitting the evidence.  Mr. Blomquist was not allowed to cross-examine the evidence or offer evidence in rebuttal, in spite of his request.

The absence of cross examination is itself a flaw that cannot be remedied by review of the balance of the record.  The lack of opportunity to cross examine or rebut leaves the reviewing court without ability to determine whether the outcome is affected by the procedural defect.  Mr. Blomquist was not afforded due process and statutory requirements were not met, because Mr. Blomquist was not allowed to cross examine and serve inquiries upon the Commissioner's post-hearing neurological expert.  This error requires remand.

---

[120] *Id.* at 146.
[121] *Id.* at 147.
[122] *Id.* (citing 42 U.S.C. § 405 (b)(1)).
[123] *Id.*

**5. On Remand, All Factors Relating to RFC Should Be Considered**

Claimant argues that the Commissioner failed to conduct a proper RFC analysis because he did not consider any mental limitations.[124]  Claimant also argues that the ALJ failed to make adequate findings regarding his severe impairments.[125]  These arguments (and the next, regarding the hypothetical questions posed to the VE) relate to the record on mental impairments.  This record was largely developed after the hearing.

When determining RFC, the Commissioner should assess the "physical, mental, sensory, and other requirements of work."[126]  "[A] limited ability to carry out certain mental activities . . . may reduce . . . ability to do past work and other work."[127]  Claimant argues that the post hearing mental examination by Dr. McGill showed a learning disorder and global assessment of functioning at 62 out of 100.[128]  After the ALJ's decision, claimant obtained his own neuropsychological testing from Dr. Houston who noticed that Mr. Blomquist suffers elements of dementia.[129]  The results of this latter examination never came before the ALJ, but were available to the Appeals Council.

Defendant does not directly respond to Plaintiff's argument that the RFC failed to refer to mental disabilities.  Rather, defendant responds by arguing that the ALJ's RFC determination was supported by both medical and non-medical evidence.[130]  Defendant claims that "no medical source that examined or treated Plaintiff opined that he was disabled because of his medical

---

[124] Brief for the Petitioner, *supra* note 64, at 14.
[125] *Id.* at 13 and 16.
[126] 20 C.F.R. § 404.1545 (a)(4).
[127] 20 C.F.R. § 404.1545 (c).
[128] R. 229.
[129] R 249-250.
[130] Brief of Defendant-Appellee at 12-19, Robert A. Blomquist v. Jo Anne B. Barnhart, No. 04-1101.

condition"[131] and that the consultative examining psychologist determined that Claimant had

only mild symptoms.[132]   Defendant further argues that non-medical evidence supported the

ALJ's RFC determination through inconsistencies in Mr. Blomquist's record, including his lack

of medical treatment and his description of his activities and lifestyle.   Mr. Blomquist testified

that he had to use the bathroom every thirty minutes because of his kidney stone surgery, but did

not use the facilities for two hours in Dr. McGill's office.[133]   Defendant argues that the ALJ's

RFC determination was further supported by Mr. Blomquist's active lifestyle, including

volunteering at his church, shopping, and doing house work and cleaning.

None of Defendant's arguments respond to the specific point – that mental limitations

were not considered in the RFC formulation by the ALJ.   This is obviously true, since the

evidence of mental limitations was largely developed *after* the hearing.   On remand, the evidence

of mental limitations which is now in the record should be considered in determining the

Claimant's RFC.

## 6.  The Hypothetical Question to the VE Was Inadequate

Claimant argues that the Commissioner failed to present a proper hypothetical question

to the VE because the ALJ "must pose a hypothetical question to the vocational expert which

*comprehensively* describes the claimant's impairments."[134]   Claimant argues that questions

posed to the VE were not comprehensive of Mr. Blomquist's impairments because the ALJ did

not include the findings of psychologist Dr. McGill, who found that Mr. Blomquist had a

learning disorder and a GAF score indicating mild impairment.

---

[131] *Id.* at 13.
[132] *Id.* at 17.
[133] R. 228.
[134] *Id.* (citing *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985))(emphasis added).

Defendant responds that the ALJ could adequately determine from the medical results that Mr. Blomquist's mental impairments were not severe and did not need to be included in the hypothetical questions posed to the VE.[135]  Defendant also argues that Dr. McGill observed that Mr. Blomquist's problems were life long, citing cases which held that claimants who have been employed in spite of long-term impairments are not disabled.[136]  Defendant further argues the ALJ was not required to accept the VE's responses to questions based on limitations, and so the ALJ did not have to ask the question in the first place.[137]  All these arguments are conjectural explanations for an omission which should be justified on the record, not in hindsight.  On remand, the mental limitations which should be included in the formulation of the RFC should be included in the hypothetical questions posed – or the omission should be explained on the record.

### 7.  Failure to Provide Comprehensive neuropsychological Testing Before Final Decision

Claimant argues that the Commissioner failed to provide comprehensive neuropsychological testing before issuing a final decision.[138]  This issue is not thoroughly addressed by either Claimant or Defendant but as the case is remanded, the record is more complete with the post-hearing reports from the consultative experts and from the VA treating physician.

---

[135] Brief of Defendant *supra* note 68, at 17.
[136] R. 228.
[137] Brief of Defendant, *supra* note 68, at 20 (citing *Bean v. Charter,* 77 F.3d 1210, 1214 (10th Cir. 1995); *see also Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993)).
[138] Brief for the Petitioner, *supra* note 64, at 12.

## RECOMMENDATION

IT IS RECOMMENDED that the case be REMANDED.

Within 10 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections. A party may respond to another party's objections within 10 days after being served with a copy thereof. The rules provide that the district judge to whom the case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject or modify the recommended decision, receive further evidence, or re-commit the matter to the magistrate judge with instructions.

Dated this 15th day of June, 2006.

BY THE COURT

David Nuffer
United States Magistrate Judge